**NIGHT BOX**
**FILED**

AUG 2 3 2000

CLERK, USDC / SDFL / WPB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 00-6198-CR-HURLEY

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-

MAXIMILLIAN C. MATETICH,

        Defendant.

_____/

## GOVERNMENT'S MOTION TO REOPEN PRETRIAL DETENTION and MOTION FOR NEBBIA INQUIRY

The United States, by and through the undersigned Assistant United States Attorney, files

this Motion to Reopen the Pretrial Detention Hearing pursuant to Title 18, U.S.C. 3142(f) and

Motion for Nebbia Inquiry pursuant to Title 18, U.S.C. 3142(g)(4) and in support thereof states as

follows:

       1. A pretrial detention hearing was held before Magistrate Judge John O'Sullivan on Friday,

August 18, 2000. At the conclusion of the hearing, Magistrate Judge O'Sullivan denied the

government's request for pretrial detention and ordered the defendant to be released on conditions

of bond. The United States Attorney's Office has received the transcript of the hearing (attached

hereto). Based on the oral pronouncements in court, the conditions include <u>inter alia:</u> $100,000.00

1



corporate surety bond, cosigned by the defendant's fiancee[1] and Mr. Randy Swears; and a

$500,000.00 personal surety bond co-signed by the defendant's fiancee and Mr. Randy Swears;

along with a Nebbia condition.

2. While the pretrial detention hearing was ongoing in Miami,[2] undersigned counsel, who

is assigned to this case, contacted U.S. Customs concerning the defense witnesses that were set forth

in the pleading styled "Motion in Support of Bond" that the government received the afternoon

before the hearing. At approximately 11:30 am on Friday, August 18, 2000, undersigned counsel

learned that there is a file at U.S. Customs which reflects that in 1996, a vessel was seized in an

international money laundering prosecution. Mr. Swears told Customs agents over the telephone

the seized vessel was his vessel. Mr. Swears agreed to be interviewed. Although the vessel was

worth $100,000, Mr. Swears failed to appear at 2 interviews scheduled by U.S. Customs agents.

The vessel was ultimately forfeited. The government has contacted the case agent, now stationed

in Berlin, Germany. Matters contained in the Customs file may have some bearing on the Court's

decision concerning the sureties and may be relevant as to the Nebbia condition.

3. Secondly, the transcript of the hearing reflects that the Court agreed to accept Ms. Marie

Ange Caravano, age 23, a French citizen in this country on a temporary visa which expires in

September, as a co-signor on a $100,000 corporate surety bond and as a co-signor on a $500,000

personal surety bond. The Court referred to Ms. Caravano as the defendant's fiancee. The Court

inquired of Ms. Caravano whether she would be residing with the defendant and she indicated that

---

[1]The Pretrial Services Report refers to Ms. Caravano as the defendant's fiancee.

[2]Undersigned counsel's mother was scheduled for surgery at 1:00 pm on Friday, August 18, 2000.

she would. The Court then ordered that Ms. Caravano act as a custodian of the defendant, promising to alert a Pretrial Services Officer if the defendant was not at home with her in compliance with the Court imposed curfew. The case agents, mindful that the defendant, Mr. Matetich was heard on the consentual recordings to be lamenting that Ms. Caravano was now dating a lawyer, contacted that lawyer to confirm Ms. Caravano's current residence. Yesterday afternoon, the government interviewed the lawyer who advised that Ms. Caravano has been in a relationship with him. He stated that Ms. Caravano does not reside in the defendant's apartment, rather she lives in her own apartment and has been living there for some period of time. The lawyer advised that Ms. Caravano consulted with her mother concerning the arrest of the defendant and her mother advised her not to say anything or sign anything. Ms. Caravano told the lawyer after the Pretrial Detention hearing on Friday that she did not understand the implications of a bond or that she would be liable to the United States government. This lawyer, who is a trial lawyer in Miami, told the government that he would be willing to testify before this Court has to his knowledge of the facts.

3. The government's suggestion is that, in light of the conflicting information concerning Ms. Caravano's residence and engagement, it would be unfair to the United States and to Ms. Caravano for Ms. Caravano who is only 23, a citizen of France and has no assets, to be liable for $600,000 to the United States government should the defendant flee. It would also put Ms. Caravano at risk should the defendant violate his curfew or violate the law by continuing to engage in his international ecstasy business.

4. The government asks the court to review the information from U.S. Customs and revisit

3

the issues concerning Ms. Caravano at a further hearing to be set by the Court.

Respectfully submitted,

GUY S. LEWIS
UNITED STATES ATTORNEY

By: *Nancy Vorpe Quinlan*

NANCY VORPE QUINLAN
Assistant United States Attorney
Florida Bar No. 0593532
500 Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711 ext 3054
Fax: (561) 820-8777

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the Government's Motion to Reopen the Pretrial Detention hearing by fax to Howard Srebnick, Esquire this 23rd day of August, 2000.

*Nancy Vorpe Quinlan*

NANCY VORPE QUINLAN
Assistant United States Attorney

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,                    No: 00-3131-TURNOFF

                    Plaintiff,               Miami, Florida
                                             August 18, 2000
        v.

MAXIMILLIAN MATETICH,

                    Defendant (s).

_____/

        TRANSCRIPT PRETRIAL DETENTION HEARING
    BEFORE THE HONORABLE JOHN J. O'SULLIVAN,
        UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiff:          DAVID WEINSTEIN,
                            Asst. U. S. Attorney
                            99 N.E. 4th Street
                            Miami, Florida  33132-2111

For the Defendant:          HOWARD SREBNICK, ESQ.


Transcriber:                F. Levy

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida  33130

2

1            I N D E X

2    RANDALL SWEERS

3    CROSS EXAMINATION
     BY MR. WEINSTEIN . . . . . . . . . . . . . . . . . . . 19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  United States vs. Maximillian
2   Matetich.
3           MR. SREBNICK:  Good morning again, Your Honor.
4           THE COURT:  Good morning.
5           MR. SREBNICK:  Howard Srebnick on behalf of Mr.
6   Matetich, is the way it's pronounced.
7           THE COURT:  Matiche (phonetic).
8           MR. SREBNICK:  Yes, Your Honor.  But it's
9   spelled correctly M-A-T-E-T-I-C-H.
10          THE COURT:  Okay.
11          MR. SREBNICK:  I'm here as temporary counsel for
12  the pretrial detention hearing.  I was going to ask that
13  the arraignment and the report re counsel be deferred
14  until ten days from now, August 29th or 30th, somewhere in
15  there, whatever is convenient for the Court.
16          THE COURT:  Okay.
17          MR. SREBNICK:  So that I can conclude my
18  arrangements with Mr. Matetich for permanent
19  representation.
20          MR. WEINSTEIN:  Good morning, Your Honor.  David
21  Weinstein on behalf of the United States.  I'm standing in
22  for Nancy Vorpe-Quinlan.
23          Your Honor, this case has been indicted.  It's a
24  Judge Hurley case out of Fort Lauderdale, so any reports
25  with regard to report re counsel and/or arraignment, if we

4

1    could set those in the division where this case is
2    assigned.
3             THE COURT:  In West Palm.
4             That would be appropriate, wouldn't it, Pilar?
5    Okay.
6             MR. SREBNICK:  Judge, we're prepared to go
7    forward with the PTD hearing today.
8             THE COURT:  Okay.  The case number is --
9             MR. WEINSTEIN:  I have it here, Your Honor:
10   6198-Hurley, 00-6198-Hurley.
11            MR. SREBNICK:  Judge, since it's just a
12   formality, since I'm in Miami and Mr. Matetich is in Miami
13   and we don't need the actual prosecutor in the case, if
14   possible could we just keep the arraignment for the duty
15   so that I can not have to travel for the five minute
16   formality; is that possible?
17            THE COURT:  Where will this defendant be housed,
18   Marshal?
19   He's on a Hurley case, will he stay here at the Federal
20   Detention Center?
21            THE MARSHAL:  More than likely.  Once he goes up
22   for the case, then he'll be housed in one of the local
23   jails.
24            THE COURT:  Okay.  Yeah, I'll set it here, then.
25            August 29th at 10 a.m. for arraignment and

5

1    report re counsel.

2              No further continuances on the arraignment or

3    the report re counsel.

4              MR. SREBNICK:  Understood.

5              We're also on for bond.

6              THE COURT:  Today, yeah.

7              Could I see a copy of the indictment?

8              MR. SREBNICK:  Does Your Honor have a copy of

9    the motion that I submitted yesterday?

10             THE COURT:  Yeah, I got that motion.

11       (Brief pause.)

12             MR. WEINSTEIN:  Does Your Honor have a copy of

13   the complaint that was filed?

14             THE COURT:  I do have a copy of the complaint,

15   yeah.

16             Can I keep this, or do you need it?

17             MR. WEINSTEIN:  I need it back.  If somebody can

18   make a copy of it.

19             THE COURT:  Okay.  You can have it back, just --

20   I don't need it.  We need one for the court file,

21   somewhere along the way because there's none in the file

22   down here, but we can get it from you at the end.

23             Or maybe after this hearing, you can go to my

24   chambers and copy it, and deliver a copy to Pilar.

25             MR. SREBNICK:  Your Honor, may we approach in

6

 1    camera on one matter, both parties?

 2              THE COURT:  Okay.

 3        (In camera discussion.)

 4              THE COURT:  Okay, is the government prepared to

 5    go forward on the detention hearing?

 6              MR. WEINSTEIN:  We are, Your Honor.

 7              THE COURT:  And is the defense prepared?

 8              MR. SREBNICK:  We are, Your Honor.

 9              THE COURT:  Okay.

10              All right, let me hear from the government

11    first.

12              MR. WEINSTEIN:  Your Honor, we would adopt the

13    factual allegations that are contained within the

14    complaint that was filed before Judge Turnoff.

15              In addition to that, this case has been indicted

16    so there are presumptions that attach.

17              At this point we're proceeding on risk of flight

18    and danger to the community.

19              This is a crime that's punishable by more -- a

20    maximum penalty of more than ten years.  We're talking

21    about 50,000 pills of Ecstasy here, at the bare minimum,

22    which, by conversion and computation, is approximately a

23    Level 28.

24              There is no minimum mandatory, but he's looking

25    at about 78 to 97 months.

1         This defendant, as laid out in the factual

2   allegations was in charge of the importation and

3   distribution of the Ecstasy tablets.

4         In addition, at the time of his arrest he made

5   an admission to the agents regarding his involvement.

6         The agents also seized records from the

7   defendant that mirrored the allegations contained in the

8   complaint with regard to the distribution of the Ecstasy.

9         As to risk of flight, while the defendant has

10   presented a motion for bond to this Court, the defendant

11   is a Canadian citizen.  The defendant possesses a Canadian

12   passport, and while he has a residence in South Florida on

13   South Beach, there is no indication whatsoever that the

14   defendant has entered the United States legally to obtain

15   that residence.

16         There is no verification of any INS records

17   showing that he made a lawful permanent residency here.

18   If at best it's a temporary residency.  That's certainly

19   not his permanent address.

20         In addition, the passport that was seized from

21   the defendant at the time of his arrest lists an address

22   on Coburn (phonetic) Street in London, Ontario, Canada as

23   the address for his passport.

24         It does not list the South Beach address.

25         While he claims to have ties to South Florida,

8

1    his ties are entirely to the country of Canada.

2            With regard to his residency here, while he

3    claims he has been residing here since 1995, in 1996 the

4    defendant was stopped attempting to make an entry into the

5    United States in the Detroit, Michigan area.

6            At that time he had in his possession two

7    Florida ID's with different dates of birth.

8            He also indicated to the inspectors there that

9    he was here on -- going at that time on a shopping spree.

10   However, the possessions that he had with him were

11   inconsistent with that.

12           He was denied entry into the United States at

13   that time and turned around and sent back to London,

14   Ontario.

15           THE COURT:  When was that?

16           MR. WEINSTEIN:  In 1996, on February the 12th of

17   1996.

18           And at that time the address that he provided

19   was the Coburn Street address.

20           In his motion the defendant claims that he's

21   been residing in South Beach since 1995, at the South

22   Beach address.

23           He lists no permanent source of employment and

24   income other than an inheritance that he obtained from his

25   parents at the time of their death.

9

1              He also claims to be in the clothing business.

2              While he may have witnesses to present alleging

3      ties to South Florida, none of those witnesses are

4      American citizens.   Only one of the witnesses has a

5      residence within the Southern District of Florida.

6              In addition, during the conversations that the

7      defendant had with the cooperating witness, he indicated

8      that he ran a turnkey operation that allowed him to have

9      easy access to additional funds that are available.

10             It's the position of the United States, based on

11     the presumption that attaches to this indicted case, the

12     fact that he's looking at a fairly substantial amount of

13     time in jail, the fact that he has no ties to the Southern

14     District of Florida, and that he is a Canadian citizen,

15     there are no conditions that this Court could set that

16     could guaranty and assure his appearance here, nor that

17     would guaranty the fact that the defendant could still

18     continue to run his importation and distribution of

19     Ecstasy with regard to the tablets that he has already

20     imported up to this date.

21             THE COURT:   Okay.

22             All right, let me hear from the defense.

23             MR. SREBNICK:   Good morning, Your Honor.

24             Mr. Matetich is a Canadian citizen.   He does

25     have a Canadian address; that's where he grew up.

10

1          However, he has had a residence here in Miami

2 Beach for the last five years. It's set forth in our

3 pleading, together with the proof of his residency.

4          He's paid rent, has a phone bill. He has an

5 electric bill. He's had a residence here in South

6 Florida.

7          While it's not a permanent address, and he's not

8 a permanent resident of the United States, he does have a

9 place that he lives here in Miami when he's living in

10 Miami.

11          THE COURT: Does he maintain a residence in

12 Ontario as well?

13          MR. SREBNICK: That's where he's from. Yes, so

14 -- he has an aunt who lives in Ontario, an 80-year-old

15 aunt.

16          He's an orphan. Both of his parents are

17 deceased. But his aunt, who I've spoken to, who's 80

18 years old, lives in Ontario and that's who he visits, and

19 that's his only real family member at this point in his

20 life, given the death of his parents and he has no living

21 siblings.

22          THE COURT: Is that where he lives when he's in

23 Ontario?

24          MR. SREBNICK: Yeah. He lives in -- when he

25 lives in Ontario, that's who he lives with his, aunt.

1       He is a graduate of the University of Western

2   Ontario from Canada.  He's attended the London School of

3   Economics.

4       And let me just start by saying we are not here

5   to debate the strength of the government's case, other

6   than to say that the one person with whom the government

7   alleges he was involved with the importation of these

8   pills, Greg Collins, his codefendant -- and it's the only

9   episode that Mr. Matetich has been involved in according

10  to the government's own evidence with regard to

11  importation into the United States -- that person, who

12  became a cooperating witness -- was released on a

13  stipulated bond of $100,000 personal surety, together with

14  that person's sister, another defendant in this case.

15      So the two other defendants in this case have

16  been released on a personal surety bond of $100,000.

17      So let's start there.

18      THE COURT:  Are they U.S. citizens?

19      MR. SREBNICK:  They are.  There's no question

20  that as a result of that they have a stronger case for

21  bond, but just in terms of the strength of the evidence,

22  the case -- they caught those two cold and agreed on a

23  bond for them.

24      What I'd like to point out, however, is although

25  Mr. Matetich is an orphan, doesn't have direct family

12

1    members, he does have very close friends who have come to

2    court today -- three from Canada have flown in and that's

3    why we had postponed this.

4              And I'd like to introduce those people to Your

5    Honor right now.

6              Let me start with Randy Sweers (phonetic). And

7    I'm going to tell you a little bit more about him in a

8    second. He lives in South Florida. He has a business

9    here in South Florida. He's the first person that I

10   listed in our motion for bond, Judge.

11             THE COURT:  Umm-hmm.

12             MR. SREBNICK:  He is going to be the person with

13   the financial means to collateralize a bond that Your

14   Honor might set in this case.

15             I'd like to introduce Marie Ange Caravano

16   (phonetic).

17             I'd like to introduce Demetra Capples

18   (phonetic).

19             I'd like to introduce John Wood.

20             And I'd like to introduce Martine Lanu.

21             We have four -- I said three.  Four people from

22   -- three Canada.  Marie Ange is a French national who

23   works for CNN here in South Florida.

24             All of those persons have known Charlie for

25   years.  Some of them went to school with Charlie.

13

1          And I call him Charlie, Your Honor, that's his

2  middle name.

3          Mr. Matetich is Maximillian Charles Matetich.

4  He's known as Charlie.

5          They've known him for years.

6          And I don't need to waste the Court's time; the

7  Court has had an opportunity to look at our motion.

8          Each of these persons is a substantial

9  individual.  College graduates.

10         Marie Ange has a graduate degree in journalism.

11         Ms. Capples is an investment banker with Bay

12  Street Direct, Inc.

13         John Wood works for an internet company called

14  UU Net (phonetic), a division of Worldcom.

15         These are real people who went to universities,

16  they are people of substance, all of whom have come to

17  Miami, at great expense to themselves, to tell Your Honor

18  that they trust Charlie, they know that even if Charlie

19  made a mistake and did something wrong, he will honor his

20  promise to Your Honor to be in court whenever he needs to

21  be in court.

22         I'd like to speak about Randy Sweers for a

23  moment, and I don't know if Your Honor wants to have me

24  present him as a witness, or if you'd like me to proffer,

25  and then he'd be available for cross-examination in the

1    event that Mr. Weinstein would like to cross examine.

2              THE COURT:  Yeah, why don't you proffer, if you

3    would.

4              MR. SREBNICK:  Randy Sweers is also from Canada,

5    although he has relocated to South Florida.  He graduated

6    high school here in South Florida, Pompano Beach High

7    School.  He has a bachelors from Wilfred Lar University, a

8    graduate business school attendee.

9              He was a member of the Canadian Junior Olympic

10   basketball team in Canada.  Relocated to South Florida,

11   was working as a salesman, started as a salesman for

12   Champion Marine up in North Miami, and started his own

13   business in 1994, where he is the president, 100 percent

14   owner of a company in Fort Lauderdale called Florida Power

15   Boat Brokerage, Inc.  You can find it on the internet if

16   you're interested, Your Honor.

17             And he does a very good business here in South

18   Florida.  He has sales of three million dollars a year.

19   He has inventory -- over half a million dollars equity in

20   his inventory, and he is telling Your Honor he's known

21   Charlie for 25 years, and while he has nothing to do with

22   the allegations in this indictment, he knows that Charlie

23   will keep his promise to come to court if Your Honor sets

24   a bond.

25             He's so confident of it, Your Honor, he's

1     willing to sign his name on the bond, both in his personal

2     and in his corporate capacity.

3            He would lose his home which he owns at 5870

4     Northeast 22nd Avenue.  He would lose his home, and he

5     would risk his entire business, his entire future, because

6     he knows that his friend of 25 years would not turn his

7     back on the court, and certainly would not turn his back

8     on him.

9            I've also discussed with Mr. Sweers the general

10    allegation people make, well, maybe the defendant will pay

11    him under the table and all of this business.

12           Randy Sweers says point blank, it's not going to

13    happen.  Number one, he would never do that, but, number

14    two, he knows the personal finances of Mr. Matetich.  Mr.

15    Matetich simply doesn't have the ability to make those

16    payments.

17           While the government is going to allege he's

18    been in the Ecstasy business and blah, blah, the fact is,

19    even the government's own evidence establishes a very

20    small amount of income that Mr. Matetich was making off of

21    this.  He lives a very modest -- Mr. Matetich lives a very

22    modest lifestyle.  His apartment in South Beach, I think

23    the rent is $800 a month.  He is not a man of great means.

24           He did inherit quite a bit of money, twenty or

25    fifteen years ago when his parents died.  Unfortunately,

16

1   he was not a good investor of that money and the money is

2   gone.

3               What I tell Your Honor, based on the contacts

4   that Mr. Matetich has, the Court can set a bond, let him

5   go to his home on South Beach.  He can remain at his home

6   until the case is over.  We've got people willing to

7   guaranty his appearance in court, Judge.

8               THE COURT:  Let me ask you about Mr. Sweers,

9   does he have a business in Canada and a home in Canada as

10  well?

11              MR. SREBNICK:  Let me call Mr. Sweers up and

12  introduce him to the Court.

13              THE COURT:  Sure.

14              MR. SREBNICK:  Randy.

15              THE COURT:  Let me have him raise his right

16  hand, please.

17          RANDY SWEERS, DEFENDANT'S WITNESS, SWORN

18              THE COURT:  Did you want to ask him anything

19  first?  You don't need to go over the proffer again.

20              MR. SREBNICK:  Just if you'd introduce yourself

21  to the Court and tell him a little about your business and

22  your contacts to Canada, and your parents and all of that.

23              THE WITNESS:  My name is Randall Sweers.  I was

24  originally born in Barry, Ontario, Canada, the same city

25  where I met Charlie when I was ten years old.

Aug-22-00 02:58P                     P.12

Case 0:00-cr-06198-DTKH  Document 28  Entered on FLSD Docket 08/24/2000  Page 21 of 42

17

1     I've known Charlie since he was ten.  I've been

2 in contact with on a weekly basis, a monthly basis, since

3 then.

4     I consider him a very close friend of mine.

5     THE COURT:  Do you actually live in Miami or do

6 you live in Canada?

7     THE WITNESS:  I live in Fort Lauderdale.

8     THE COURT:  In Fort Lauderdale?

9     THE WITNESS:  Yes.

10     THE COURT:  Full time?

11     THE WITNESS:  Full time.

12     THE COURT:  Do you have a residence in Canada?

13     THE WITNESS:  No.  I'm a permanent United States

14 resident.  I do travel back to Canada quite often, but I

15 do not have a residence in Canada.

16     THE COURT:  And where is your brokerage business

17 work out of?

18     THE WITNESS:  It's in Dania, Florida, which is

19 basically just outside of Fort Lauderdale.

20     THE COURT:  What is the address of that

21 business?

22     THE WITNESS:  3402 Southwest 26th Terrace, Suite

23 B-3, Dania, Florida 33312.

24     THE COURT:  What are your yearly sales?

25     THE WITNESS:  About three million dollars a

18

1    year.

2            THE COURT:  And what type of inventory -- I'm

3    sorry, it says "inventory/accounts receivable, 500,000."

4    What is that made up of?

5            THE WITNESS:  I own -- I spec buy a lot of --

6    it's high performance boats, and I do cigarette-type

7    boats, scarabs, things like that.  And I own a lot of

8    inventory that I purchased for resale, as well as doing

9    out and out brokerage.

10           I also own a house in Fort Lauderdale, vehicles.

11           THE COURT:  What's the value of your home?

12           THE WITNESS:  Probably between 200 and 250,000.

13           THE COURT:  And how much is the mortgage on it?

14           THE WITNESS:  About 145.

15           THE COURT:  And what type of cars do you have?

16           THE WITNESS:  I own a '97 Porsche twin turbo.  I

17   own a Harley-Davidson.  I own a Dodge truck.

18           THE COURT:  Are there notes on those?

19           THE WITNESS:  Yes, but they all have a lot of

20   equity in them.

21           THE COURT:  Does the government have any

22   questions for Mr. Sweers?

23           MR. WEINSTEIN:  Yes.

24                      CROSS-EXAMINATION

25   BY MR. WEINSTEIN:

19

1   Q    Yes, of that inventory, how many of those boats are

2   actually owned by you and the company, versus how many are

3   just inventory and are floating through, so to speak, as a

4   brokerage?

5   A    Any of the boats that I have described as being the

6   500,000, I own those free and clear.  There's no notes

7   against them.

8        I have far more inventory than the 500,000, but

9   a lot of that is on brokerage.  I probably have about

10  three or four million dollars on brokerage, but actual

11  stuff that I own, is probably about 500,000.

12  Q    You're the sole owner of that home on Northwest 22nd

13  Avenue?  Anybody else on the deed or the mortgage?

14  A    No.

15  Q    You said you were a permanent U.S. resident, when did

16  that happen?

17  A    1990, I believe.  I've lived here since 1976.  I was

18  a resident underneath my parents.  My mother is originally

19  from Canada and my father from Europe.

20  Q    You retain Canadian citizenship as well, dual

21  residency?

22  A    I do -- no, not dual residency, but I am still a

23  Canadian citizen, but a legal U.S. resident.

24  Q    And your taxes, you pay Canadian taxes or United

25  States taxes?

1       A       United States taxes.

2               MR. WEINSTEIN:  Nothing else, Your Honor.

3               THE COURT:  Thank you.

4               All right, thank you, Mr. Sweers.

5               Mr. Srebnick, how come Mr. Maletich has no

6       witnesses here who live in the United States -- I mean,

7       who are United States citizens, or live in the United

8       States, other than Mr. Sweers?  He's been here for six

9       years?

10              MR. SREBNICK:  Well, the answer to that is,

11      people that are -- his girlfriend, who is here in court

12      today, she's not a U.S. citizen, but she is his

13      girlfriend.

14              THE COURT:  Who is that, which woman is that?

15              MR. SREBNICK:  Marie Ange Caravane.  She's

16      worked as an intern for CNN.  They've been friends for

17      four years.

18              She just stood.

19              I have spoken, for example, with his landlord.

20      I spoke with the people at his building, but these are

21      just people who know him in that context, and I didn't

22      think they would be helpful in terms of a bail issue.  I

23      thought what would be most helpful are the people that

24      have known him for a long period of time.  And I called

25      the people that know him, rather than the people that see

21

1   him.

2              THE COURT:  Right.

3              MR. SREBNICK:  There's no debate, based on the

4   documents that I've tendered to the Court, that he's had

5   the residence.  His landlord confirmed that he's been

6   paying rent for five years.  Southern Bell confirms it.

7   Florida Power & Light confirms it.  His girlfriend

8   confirms it.  Randy Sweers confirms it.

9              The other folks from Canada who come down here

10  and visit with him, who have lived in his apartment, and

11  who are staying there right now while Mr. Maletich is in

12  custody, waiting to find out if he has bail, they've all

13  confirmed this is where his residence is in South Florida.

14             I don't dispute that he has family in Canada,

15  and I don't even dispute that he has a business that sells

16  handbags and leather goods in Europe.  But the issue is

17  can the Court fashion a bond and say to Mr. Matelich, Mr.

18  Matelich, you stay at your home on South Beach pending the

19  resolution of this case.  Mr. Sweers, you can lose a half

20  a million dollars in inventory by signing on the bond, not

21  to mention your personal home.  Will that keep Charlie

22  here in Miami or West Palm, wherever the court is, pending

23  the resolution of this case.

24             I submit to the Court, given the other bonds set

25  in this case by stipulation, given other bonds that I've

1    seen in this courthouse, where Ecstasy cases by Canadian

2    nationals have gotten bond, I think this is a case, given

3    the quality of Mr. Sweers' guaranty, where the Court can

4    set a bond, put Mr. Sweers on the hook -- and anybody else

5    the Court feels would be appropriate.  And what more can

6    someone do who's not a U.S. citizen to get a bond in a

7    case?

8            There's no mandatory minimum in this case.  And

9    while there certainly a presumption based on the statutory

10    maximum, we don't even know what the weight of the

11    substances are yet.  And whatever the predictions are of

12    the government, there is no mandatory minimum.

13            I think that given all of those factors the

14    Court can fashion a bond.  If it requires a curfew, if

15    worst case scenario the Court says put an electronic

16    bracelet, stay in your home on South Beach, we can do

17    that, too.

18            Whatever the Court says.

19            That's all I have to say, Your Honor.

20            THE COURT:  Mr. Weinstein.

21            MR. WEINSTEIN:  Your Honor, a couple of things.

22            In addition to the Miami address, at the time of

23    his arrest he also gave an address in Barcelona, Spain.

24    So the defendant has multiple residences in multiple

25    countries throughout, not just North America, but we're

1    talking about throughout the entire world with the Spanish

2    address.

3        In addition to that, the defendant claims that

4    he doesn't have a significant income from the Ecstasy

5    business.  Just based on a review of the documents at the

6    time of his arrest, he had accounts receivable due to him

7    in the Ecstasy business for approximately $160,000, and

8    that was just concerning two of the deals that were

9    pending, one of which did not involve the cooperating

10   witness.

11       In addition, the passport that was seized from

12   the defendant at the time of his arrest was a passport

13   that replaced one that was reported lost in Copenhagen.

14   And it also shows extensive travel throughout Europe as

15   well as in and out of the United States from 1997, '98,

16   '99 and 2000.

17       For an individual that claims to have a

18   residence in South Beach that he's had for the last five

19   years, he doesn't spend a lot of time there.  The passport

20   reflects travel in and out of the United States,

21   extensively, without residing in the South Florida

22   address.

23       The defendant also, by his own admission, and by

24   his own submission, he shows no lawful entry into the

25   United States on either a tourist visa on a permanent

1    resident application, on a work visa, yet he claims to own

2    a residence down here and is now claiming to be in that

3    residence. And at the time that he claimed to have that

4    residence was when he made that entry, or attempted to

5    make the entry, into Detroit, Michigan from London,

6    Ontario where he was turned around and sent back into

7    London, Ontario because he possessed two Florida ID cards

8    with different dates of birth on them.

9         Your Honor, this defendant presents a

10   substantial risk of flight. He has worldwide ties. He

11   has accounts receivable to him in his Ecstasy business

12   that are not money that's on the books.

13        As for the individuals that are willing to put

14   up their property and willing to vouch for him, he

15   presents no one who is a United States citizen.

16        Mr. Sweers is a permanent resident of the United

17   States, and he's willing to sign some property up there,

18   but I would suggest that's not going to be enough at this

19   point to guaranty the defendant's appearance and also his

20   inability to continue to conduct his Ecstasy business.

21        I think that based on the presumptions and based

22   upon the evidence that's been presented to Your Honor at

23   this point that the government has met their burden, and

24   there are sufficient facts that you can find that would

25   substantiate an order of pretrial detention as to the

25

1    defendant, both on risk of flight and danger.

2         As to the quantity of the drug, we're dealing

3    with a minimum of 50,000 pills, and these are pills that

4    there are -- at this point the legislature has not

5    established a minimum mandatory, however, by conversion,

6    again, he's looking at 78 to 97 months; that's at a base

7    level, without enhancement for organizer.  And that's

8    where he begins.

9         As to the fact that a bond has been set as to

10   two other codefendants, both of those codefendants are

11   United States citizens, and there were additional facts

12   considered by the Assistant United States Attorney at the

13   time they stipulated to a bond with regard to those

14   defendants.

15        That should not be an overriding factor showing

16   that this defendant is not a risk of flight or a danger to

17   the community.

18        THE COURT:  As far as danger to the community,

19   are you basing that on his distribution of drugs, or is

20   there any evidence that he is of a violent nature?

21        MR. WEINSTEIN:  Based upon the statutory

22   presumption and his distribution of drugs.

23        This is a controlled substance that's relatively

24   new.  There are studies on both sides that deal with the

25   fact that this is a dangerous substance, and that when it

26

1    is abused it can result, and has resulted, in death and

2    serious bodily harm.

3         There is no mandatory minimum that's been

4    established by Congress, or the Senate, with regard to

5    this particular controlled substance as they've done with

6    cocaine and also with marijuana.

7         However, it is scheduled as a dangerous

8    controlled substance and the presumption applies since the

9    maximum penalty is greater than ten years.

10        THE COURT:  How would this gentleman support

11   himself, Mr. Srebnick, if he was released on a bond?

12        MR. SREBNICK:  I know that his -- I spoke to his

13   friends about that because, as a Canadian citizen, just to

14   make sure we're clear -- Canadians don't need to go to INS

15   and get visas and all of this.  A Canadian can just come

16   into the United States.  He does not have work papers here

17   in the United States to work.  He was working in the

18   handbag business in Barcelona, and we don't deny it.  His

19   passport shows it.  He disclosed that to the government

20   and to the Pretrial Services office.

21        The answer to your question is, I've spoken to

22   his friends.  His rent is going to be paid for either by

23   Mr. Sweers or one of his other colleagues. I spoke to his

24   aunt in Canada.  These people have the ability to make

25   sure he has all of his bills paid for during the pendency

27

1    of this case.

2              MR. WEINSTEIN:  Your Honor, just one -- with

3    regard to that comment -- Canadian citizens are entitled

4    to enter the United States to visit and to vacation.

5    However, if they intend to make permanent residence in the

6    United States, they're obligated, as any other foreign

7    national, to notify INS and make an application.  He can't

8    just come here and live here and say he's a Canadian

9    citizen.  They ask when they cross the border what the

10   purpose of their visit here is.

11             INS has no record of this defendant making a

12   lawful entry one way or the other with regard to his entry

13   into the U.S. to permanently -- what appears to be a

14   permanent residence in South Beach according to his own

15   testimony.

16             MR. SREBNICK:  May I clarify?  He doesn't own

17   the residence, he rents it.

18             THE COURT:  I realize that.  Okay.

19             MR. SREBNICK:  So we're clear.

20             THE COURT:  And I think the defendant could

21   enter the county without it necessarily being recorded,

22   coming in from Canada, but, yeah, I think the government's

23   point is well taken, that he's--if he was going to

24   establish a permanent residence here, then I think there

25   would be certain notifications that would need to be made

1    to the immigration service.

2          MR. SREBNICK:  I agree.  We're not claiming he's

3    a de facto permanent resident of the United States, or

4    that he's filing for those papers.  All I'm saying is he

5    has a residence that has been consistent, and while he

6    doesn't stay here for the statutory period of six months

7    to establish residency, he does have a place to live which

8    has been available for five years.

9          THE COURT:  Okay.

10          I find that this offense carries a penalty in

11    excess of ten years and the presumption arises as to risk

12    of flight and danger to the community.

13          I find that the defendant has overcome that

14    presumption, and I'm going to set a bond in this matter.

15          I'm going to set a 100,000 corporate surety

16    bond, to be signed by the defendant, the defendant's -- is

17    it girlfriend or fiancé?

18          MR. SREBNICK:  Yes.  Marie Ange Caravano.

19          THE COURT:  Okay.

20          And by Mr. Sweers.

21          In addition, I'm going to -- I said 100,000

22    corporate surety bond, correct?

23          In addition, I'm going to impose a 500,000

24    personal surety bond to be signed by the defendant, the

25    defendant's fiancé, and Mr. Sweers.

1        I'm going to impose a Nebbia condition on the

2   bond.

3        I'm going to require the defendant to surrender

4   all passport and travel documents to the Pretrial Services

5   office, that the defendant sign a waiver of extradition

6   from Canada to the United States, that the defendant

7   report to Pretrial Services two times a week by phone and

8   one time a week in person, that the defendant remain --

9        As far as travel restrictions, Mr. Weinstein,

10  what would you request, make it Dade County or the entire

11  Southern District?

12        MR. WEINSTEIN:  In light of the fact he's going

13  to have to make an appearance in Fort Lauderdale --

14        THE COURT:  That's right, he's going to be in

15  Palm Beach.

16        MR. WEINSTEIN:  -- and/or Palm Beach, it should

17  be the Southern District of Florida.

18        THE COURT:  Okay.

19        His travel is restricted to the Southern

20  District of Florida.

21        I'm going to order that Mr. Sweers, or any of

22  the signatories to the bond, with the exception of Mr.

23  Sweers' inventory -- since he's in the business of selling

24  boats, I don't want to prevent him from selling boats that

25  he owns -- but as far as any other assets he has, such as

30

1   his automobiles and his residence, or anything else that,

2   any other asset that he owns, he's not to sell, pledge,

3   mortgage, hypothecate or in any other way encumber any

4   property that he owns, real or personal, until such time

5   as the bond is discharged or otherwise modified by order

6   of the Court.

7         Mr. Sweers, do you understand that?

8         THE WITNESS:  Yes, sir, I do.

9         THE COURT:  Okay.  Could you come up for a

10  moment?

11        You understand that in posting this bond, if the

12  defendant does not abide by all of the conditions of the

13  bond, which include him appearing in court and other

14  things, that the bond could be forfeited and that the

15  government could come to you to collect $500,000 on the

16  personal surety bond, and a bondsman $100,000 on the

17  corporate surety bond?

18        THE WITNESS:  Yes, I do.

19        THE COURT:  So you would be out $600,000 if Mr.

20  Maletich does not show up at court.

21        THE WITNESS:  That's correct.

22        THE COURT:  You're willing to take that risk?

23        THE WITNESS:  Yes, I am.

24        THE COURT:  Okay.  You also understand that I've

25  ordered that you not be permitted to encumber in any way

31

1   any property that you own, other than the inventory of

2   boats that you own, since you're in the business of buying

3   and selling boats?

4          THE WITNESS:  Correct.

5          THE COURT:  You understand that?

6          THE WITNESS:  Yes.

7          THE COURT:  And if you were to violate any of

8   those conditions of the bond, you as well could be held in

9   contempt of court and perhaps charged with a felony.

10         THE WITNESS:  I understand.

11         THE COURT:  Okay.  All right, thank you, Mr.

12  Sweers.

13         MR. SREBNICK:  Judge, may I make one request:

14  Rather than paying the bondsman fee, can we deposit that

15  money, or even a little more money, into the registry of

16  the Court, so as not to put Mr. Sweers out financially?

17         THE COURT:  Yeah, I understand that, but I

18  prefer to have a bondsman involved in this matter if Mr.

19  Sweers should become a fugitive.

20         MR. SREBNICK:  Mr. Matetich.

21         THE COURT:  Mr. Matetich.

22         Mr. Sweers, you can go anywhere you want.

23         If Mr. Matetich should become a fugitive.  I

24  just would not be comfortable with a percentage bond.  I

25  understand -- generally I don't like imposing corporate

32

1    surety bonds because it takes money that might be needed

2    for other things away from the defendant, but in this

3    instance, I'm going to require it.

4            I'm also going to impose a curfew on the

5    defendant from 9:00 p.m. in the evening until 7:00 a.m. in

6    the morning.

7            Mr. Maletich, you understand that means you have

8    to be in your residence in Miami Beach during that time

9    period?

10           THE DEFENDANT:  I do, Your Honor.

11           THE COURT:  From 9:00 p.m. until 7:00 a.m.  And

12   if you're not there -- Pretrial Services will be checking

13   on it -- if you're not there -- you'll immediately be

14   remanded to jail.

15           You understand that?  Okay.

16           Could I speak to his girlfriend as well.

17           MR. SREBNICK:  Marie Ange.

18           THE COURT:  Tell me your name, please.

19           MS. CARAVANO:  Marie Ange Caravano.

20           THE COURT:  Ma'am, I've ordered that you sign a

21   bond that would guaranty the appearance of your boyfriend

22   here in court for all future proceedings.  The total

23   amount of the bond is $600,000.

24           Although you may not have that kind of money,

25   the government could come against you and take away any

33

1    assets that you do own in order to meet that bond should

2    your fiancé not show up at court.

3            Do you understand that?

4            MS. CARAVANO: Yes, I do.

5            THE COURT:  I've also required that Mr. Matelich

6    have a curfew from 9:00 p.m. in the evening to 7:00 a.m.

7    Are you going to be residing with Mr. Matelich?

8            MS. CARAVANO: Yes, I will.

9            THE COURT:  Okay.  I'm going to require that if

10   Mr. Matelich is not in your residence from 9:00 p.m. to

11   7:00 a.m. and you're aware of that, that you're to report

12   that to Pretrial Services immediately.

13           MS. CARAVANO: Okay.

14           THE COURT:  You understand that?

15           MS. CARAVANO: Yes, I do.

16           THE COURT:  Okay.  This is the Court that's

17   ordering you to do that so if you fail to do that you

18   could be held responsible, either by contempt of court or

19   the United States government could charge you with a

20   contempt indictment.   So do you understand that?

21           MS. CARAVANO: Yes, I do.

22           THE COURT:  So it's important that you let the

23   Court know, through Pretrial Services, if Mr. Matelich is

24   not complying with any condition of the bond.

25           MS. CARAVANO: I understand.

34

1          THE COURT:  Okay.

2          Will Pretrial Services make sure this young lady

3   has the phone number to call?

4          MR. SREBNICK:  I'll take care of it, Your Honor.

5          THE COURT:  All right, thank you.

6          MS. CARAVANO:  Thank you.

7          THE COURT:  All right, thank you very much.

8          MR. WEINSTEIN:  Your Honor, a couple of other

9   additional matters.

10          THE COURT:  I wanted to ask the government if

11   they would like Mr. Matetich to wear an ankle bracelet?

12          MR. WEINSTEIN:  Yes, Your Honor.

13          THE COURT:  Okay.  I'm also going to require,

14   then, that he submit to electronic monitoring, at his own

15   expense.

16          Let me ask Pretrial Services, if he's being

17   electronically monitored, does it still make sense for him

18   to call you all, or no?

19          PTS OFFICER:  Yes.

20          THE COURT:  He should still -- but not report,

21   is that correct?

22          PTS OFFICER:  He could report in person.  It will

23   be a set date that the officer will have him come in.

24          THE COURT:  Okay.  Do you prefer that, or    when

25   you have an electronic bracelet, do you prefer that he

35

1    report as well, or not?

2              PTS OFFICER:  We prefer that he does report,

3    yes, as well.

4              THE COURT:  Okay.  All right, so I'm going to

5    keep that.

6              I'm also going to require that he submit to

7    random drug testing as prescribed by the Pretrial Services

8    Office.

9              Anything else?  I'm sorry, Mr. Weinstein.

10             MR. WEINSTEIN:  He should stay away from

11   airports, seaports --

12             THE COURT:  Okay.

13             MR. WEINSTEIN:  -- bus stations, any modes of

14   public transportation, other than transportation on and

15   off Miami Beach, obviously, but --

16             THE COURT:  Right.

17             You're to avoid all commercial transportation

18   facilities, which means no airports, no marinas and no bus

19   terminals.

20             Do you understand, sir?  Okay.

21             If you need to take a local bus, you can do

22   that, but no -- I mean, I don't know how you -- I assume

23   you have a car.  If you need to take a bus to go to

24   Pretrial Services, a local bus would be okay, anything

25   that travels interstate would not.

36

1          Yes, sir.

2          MR. WEINSTEIN:  Do you require him to seek

3     employment, or attempt to seek employment during the --

4          THE COURT:  I don't know how he's going to do

5     that if he's not -- I don't know if he'd be permitted to

6     do that, so I'm not going to require that.

7          I mean, the government believes he's here

8     illegally.  You could move immigration to have him

9     detained, but that's up to you.

10         MR. WEINSTEIN:  The other matter, I believe, is

11    that immigration is going to be lodging a -- at least a

12    48-hour detainer against the defendant to determine

13    whether or not they're going to institute any other

14    proceedings.

15         THE COURT:  They're going to -- well, that's  up

16    to you.  If INS is going to issue a detainer, then

17    obviously he's not going anywhere on the bond.

18         MR. WEINSTEIN:  And then that brings up the

19    other point: We have no other conditions that we're asking

20    you to impose at this time, however, we would request  a

21    stay in order to seek a review of the Court's ruling in

22    front of Judge Hurley.

23         THE COURT:  Okay.  I'll give you until -- how

24    much time do you need for that?

25         MR. WEINSTEIN:  Till 5:00 p.m. today.

37

1          THE COURT:  Okay.  Well, when are you going to

2     make this Nebbia?  When are you going to get the bond

3     together, Mr. Srebnick?

4          MR. SREBNICK:  It will probably be till Monday

5     before we could get all the property, and I have to have

6     Mr. Sweers' home probably encumbered by the corporate

7     surety bond.

8          THE COURT:  Okay.  Well, I'm going to stay the

9     bond until Monday at noon.  That way, if Immigration is

10    going to impose a detainer, that could be done by then as

11    well.  If not, Mr. Matelich will be free to go at that

12    time.

13         MR. SREBNICK:  Thank you, Judge.

14         THE COURT:  Okay.  Anything further on this

15    case, Mr. Weinstein?

16         MR. SREBNICK:  That's all we have.

17         MR. WEINSTEIN:  No, Your Honor, other than that

18    if Mr. Srebnick has the paperwork together he can submit

19    that to --

20         THE COURT:  The paperwork on?

21         MR. WEINSTEIN:  The Nebbia requirement.  If he

22    wants to --

23         THE COURT:  Okay, yeah.  If you all will meet on

24    the Nebbia and then let me know if you -- I want to see

25    the paperwork as well.  If you all agree to the Nebbia

**Accurate Reporting Services, Inc.**
Third Floor
172 West Flagler Street
Miami, Florida 33130

38

1  then let me know.

2      I understand that, Mr. Weinstein, the government

3  -- you may agree to the Nebbia without imposing any kind

4  of--

5      MR. WEINSTEIN:  No, my point was that we would

6  have reviewed it before we came to present it to Your

7  Honor.

8      MR. SREBNICK:  Sure.

9      THE COURT:  Right.  Okay.

10     You don't waive your right of appeal by agreeing

11  to the Nebbia is what I want to make clear.

12     MR. WEINSTEIN:  Thank you, Your Honor.

13     THE COURT:  All right, thanks a lot everybody.

14     (Whereupon the hearing was concluded.)

15              - - - - -

16     I HEREBY CERTIFY that, the foregoing is a

17  correct transcript from the electronic sound recording of

18  the proceedings in the above-entitled matter.

19

20

21

22  _Florence Levy_                August 22, 2000

23                                 _ 8 - 22 00_

24  Transcriber                         Date

25

Accurate Reporting Services, Inc.
Third Floor
172 West Flagler Street
Miami, Florida  33130